**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**MDL DOCKET NO. 5:20-MD-2947-KDB-DSC**

| | |
|---|---|
| **IN RE: LOWE'S COMPANIES, INC.** ) | |
| **FAIR LABOR STANDARDS ACT** ) | |
| **(FLSA) AND WAGE AND HOUR** ) | **MEMORANDUM OF LAW IN SUPPORT OF** |
| **LITIGATION** ) | **PLAINTIFFS' UNOPPOSED MOTION FOR** |
| ) | **APPROVAL OF COLLECTIVE ACTION** |
| ) | **SETTLEMENT** |
| **THIS DOCUMENT APPLIES TO:** ) | |
| *All Cases* ) | |
| _____ ) | |

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................................ ii

I.  INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND OF THE LITIGATION AND SETTLEMENT ........................... 3

    a.  The *Danford* action ...................................................................................... 3

    b.  The MDL ....................................................................................................... 5

    c.  Overview of the litigation proceedings prior to settlement ........................... 6

    d.  Arbitration proceedings ................................................................................. 8

    e.  Mediation ...................................................................................................... 9

    f.  Settlement terms ........................................................................................... 10

    g.  Reasonableness of settlement ..................................................................... 13

    h.  Settlement terms ........................................................................................... 20

    i.  Modification of Lowe's compensation policies ............................................ 6

III.  ARGUMENT .......................................................................................................... 21

    a.  Judicial review of FLSA settlements ........................................................... 21

    b.  FLSA issues are actually in dispute ............................................................ 22

    c.  The settlement is "fair and reasonable" ...................................................... 23

    d.  Plaintiffs' Counsel's attorney's fees are reasonable ................................. 26

    e.  The requested litigation expenses and settlement administration
        fees are reasonable ..................................................................................... 31

    f.  The proposed incentive awards are reasonable .......................................... 32

IV.  CONCLUSION ....................................................................................................... 34

# INDEX OF AUTHORITIES

## Federal Cases

*Almendarez v. J.T.T. Enterprises Corp.*,
2010 WL 3385362 (D. Md. August 25, 2010) .............................................................. 30

*Amaya v. Power Design, Inc.*,
2018 WL 690838 (D. Md. February 2, 2018) .............................................................. 30

*Andrews v. United States*,
122 F.3d 1367 (11th Cir.1997) ................................................................................... 29

*Atkins v. Sunbelt Rentals, Inc.*,
2016 WL 3647610 (D. Md. June 30, 2016) ................................................................ 30

*Barber v. Kimbrell's, Inc.*,
577 F.2d 216 (4th Cir. 1978) ..................................................................................... 28

*Beaulieu v. EQ Indus. Servs., Inc.*,
No. 5:06-CV-00400-BR, 2009 WL 2208131 (W.D.N.C. July 22, 2009) .................... 27

*Butler v. Directsat USA, LLC*,
2016 WL 1077158 (D. Md. March 18, 2016) ............................................................. 30

*Clark v. Ecolab Inc.*,
2010 WL 1948198 ....................................................................................................... 27

*Dickey v. R.R. Donnelley & Sons, Co.*,
2021 WL 1169245, 2021 U.S. Dist. LEXIS 57981, *5-6 (M.D.N.C. Mar. 26, 2021) ................ 23

*Dorsey v. TGT Consulting, LLC*,
2014 WL 458999 (D. Md. February 4, 2014) ....................................................... 30, 31

*Duprey v. The Scotts Company LLC*,
30 F. Supp. 3d 404 (D. Md. 2014) ...................................................................... 21, 22

*Flinn v. FMC Corp.*,
528 F.2d 1169 (4th Cir. 1975) ................................................................................... 27

*Frank v. Eastman Kodak Co.*,
228 F.R.D. 174 (W.D.N.Y. 2005) .............................................................................. 33

*Gaston v. LexisNexis Risk Solutions Inc.*,
2021 WL 2077812, 2021 U.S. Dist. LEXIS 97538, *21-22 (W.D.N.C. May 24, 2021) ............. 33

*Haskett v. Uber Technologies, Inc.*,
780 Fed. Appx. 25 (4th Cir. 2019) ............................................................................. 21

Case 5:20-md-02947-KDB-DSC   Document 90-1   Filed 05/20/22   Page 3 of 40

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ........................................................................................ 26

*Hood v. Uber Technologies, Inc.*,
2019 WL 93546, 2019 U.S. Dist. LEXIS 670, *21-22 (M.D.N.C. Jan. 3, 2019) ....................... 28

*Irvine v. Destination Wild Dunes Management, Inc.*,
204 F.Supp.3d 846(D. S.C. 2016) .................................................................. 30

*Kirkpatrick v. Cardinal Innovations Healthcare Solutions*,
352 F. Supp. 3d 499 (M.D.N.C. 2018).................................................. 21, 23, 28

*Kirven v. Cent. States Health & Life Co., C/A No.3:11-2149-MBS*,
2015 WL 1314086 (D.S.C. Mar. 23, 2015) ....................................................... 26

*Lynn's Food Stores. Inc. v. United States*,
679 F.2d 1350.......................................................................................... 27

*McNeil v. Faneuil, Inc.*,
2018 WL 1411017 ...................................................................................... 30

*Muhammad v. Nat'l City Mtg., Inc.*,
Civil Action No. 2:07-0423, 2008 WL 5377783 (S.D. W. Va. Dec. 19, 2008)..................... 27

*Myers v. Loomis Armored US, LLC*,
2020 WL 1815902, 2020 U.S. Dist. LEXIS 62941, *18 (W.D.N.C. April 8, 2020) .................. 33

*Newbanks v. Cellular Sales of Knoxville, Inc.*,
2015 WL 12843763 (D. S.C. February 2, 2015) ................................................... 30

*Patel v. Barot*,
15 F. Supp. 3d 648 (E.D. Va. 2014) .............................................................. 21

*Powell v. Carey Int'l., Inc.*,
547 F.Supp.2d 1281 (S.D.Fla.2008)................................................................ 29

*Riverside v. Rivera*,
477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) ......................................... 29

*Spencer v. Central Services, LLC*,
2012 WL 142978 (D. Md. January 13, 2012) ...................................................... 30

*Stillman v. Staples, Inc.*,
2009 WL 1437817, 2009 U.S. Dist. LEXIS 42247, *52-77 (D.N.J. May 15, 2009)............ 24, 25

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011)....................................................................... 32

*Temp. Servs. Ind. v. Am. Int'l Group Inc.*,
*C/A No. 3:08-cv-00271-JFA*, 2012 WL 4061537 (D.S.C. Sept. 14, 2012)................................ 27

Case 5:20-md-02947-KDB-DSC   Document 90-1   Filed 05/20/22   Page 4 of 40

*Young v. Act Fast Delivery of West Virginia, Inc.*,
 2020 WL 4808036 (S.D. W.V. August 18, 2020) .......................................................... 30

*Wineland v. Casey's Gen. Stores, Inc.*,
 267 F.R.D. 669 (S.D.Iowa 2009) ................................................................................... 34

**<u>Federal Statutes</u>**

28 U.S.C. § 1407 ......................................................................................................................... 5

28 U.S.C. § 1711(6) ................................................................................................................... 22

28 U.S.C. § 1715 ....................................................................................................................... 21

28 U.S.C. § 1715(e)(1) .............................................................................................................. 22

29 U.S.C. § 201 ........................................................................................................................... 3

**<u>State Statutes</u>**

N.C.G.S. §§ 95-25.1 ................................................................................................................... 3

**<u>Federal Rules</u>**

Federal Rule of Civil Procedure 23 ......................................................................... 21, 22, 23, 24

## I.    <u>INTRODUCTION</u>

After years of hard-fought litigation, the Rule 23 Named Plaintiffs Ronald Anderson, Erin Barrera, Kerry Cleavenger, Daniel Danford, Nabel Ekhrewish, Nicholle Frank, Thomas Fyfe, Dalton Hildreth, Antoine Hursey, Jeffrey Lavelle, Jason Martin, Jean Lou Morta, Robert Neal, Georgina Ortiz, Kenneth Payne, Stephanie Pennington, John Rafteseth, Brian Rookey, Brian Rumpke, June Shankweiler, Crystal Stratton, Iris Tirado, and Nicole Weekley, on behalf of themselves and the other 2,367 opt-in Plaintiffs covered by this Fair Labor Standards Act ("FLSA") collective lawsuit (hereinafter "Plaintiffs") and Defendants, Lowe's Companies, Inc., and Lowe's Home Centers, LLC  (hereinafter "Lowe's), have reached a settlement as set forth in the Settlement Agreement (attached as Exh. A). Once approved, the settlement will fully resolve the entire MDL, including both the conditionally certified FLSA collective action and the 19 putative state-law Rule 23 actions.

The settlement requires Lowe's to make a total, non-reversionary payment of $7,452,008.18[1] that, subject to this Court's approval, will be distributed as follows:

a.  $2,074,150 to the 2,390 opt-in Plaintiffs to be split as follows:

       i.  $1,132,645.77 to be paid to the 1,402 opt-in Plaintiffs who held Service and Support Manager or Department Supervisor positions between October 2, 2016 and March 1, 2022.

      ii.  $739,829.23 to be paid to the 218 opt-in Plaintiffs who held Loss Prevention Manager positions between October 2, 2016 and March 1, 2022.

     iii.  $59,325 to be paid to the 791 opt-in Plaintiffs who did not hold Service and Support Manager/Department Supervisor or Loss Prevention Manager positions between October 2, 2016 and March 1, 2022 and are therefore at most entitled to some amount for alleged smartphone communication damages (equaling a payment of $75 to each of the 791 opt-in Plaintiffs).

---

[1] The Parties have also settled the claims of approximately 184 arbitration claimants, each of whom was previously an opt-in Plaintiff in the FLSA litigation but was dismissed due to an arbitration agreement, *see Danford* ECF Nos. 186, 194, and subsequently filed an individual arbitration. Those settlements will be submitted to a designated single arbitrator for approval.

    iv.    $46,000 to be distributed equally ($2,000 each) to the 23 Named Plaintiffs.

    v.    $66,550 to be distributed equally ($875 each) to the 76 opt-in Plaintiffs (other than Named Plaintiffs) who were deposed and participated in written discovery and have not been dismissed from the Action.

    vi.    $29,850 to be distributed equally ($150 each) to the 199 opt-in Plaintiffs who participated in written discovery but did not sit for a deposition and have not been dismissed from the Action.

b.    $25,850 to the settlement administrator;

c.    $4,359,253.88 to Plaintiffs' Counsel for attorneys' fees, subject to reduction by the Court and with any resulting balance (at the Court's discretion) to be distributed to the opt-in Plaintiffs and/or a cy pres recipient (but not to revert to Lowe's); and

d.    $992,754.30 to Plaintiffs' Counsel for reimbursement of litigation expenses, also subject to reduction and redistribution by the Court to the opt-in Plaintiffs and/or a cy pres recipient.

(Exh. B, Stoops Decl. at ¶¶ 53(a), fn. 3; 56; 58).[2]

Although the Fourth Circuit has not specifically addressed the issue, this Court regularly holds that FLSA collective settlements must be judicially reviewed for fairness. *See* pp. 21-22 *infra*. As discussed in this brief, judicial approval of the settlement is warranted and the settlement should be implemented consistent with the terms and conditions of the Settlement Agreement.

---

[2] The total of 2,390 opt-in Plaintiffs participating in the settlement reflects the results of the Parties' efforts to resolve certain discrepancies discovered during the finalization of the settlement, and to otherwise simplify the resolution of the case. *First*, it was determined that 66 individuals provided valid opt-in paperwork by the relevant deadline, but the forms were not filed with the Court by Simpluris. The Parties have agreed to treat those individuals, for settlement purposes only, as if those consents were filed by the relevant deadline. *See* Exhibit 88-1 (opt-in forms). *Second*, opt-in Plaintiffs April Ann Rose (Consent Form at *Danford* ECF No. 128-1) and David Smith (Consent Form at *Danford* ECF No. 74-5) were each inadvertently dismissed from the litigation instead of a similarly named individual. *See* ECF No. 27 (Rose); ECF No. 53 (Smith). The Parties have agreed that Ms. Rose and Mr. Smith should be included in the settlement without regard to those dismissal filings. *Third*, the West Virginia Named Plaintiff—Thomas Fyfe—previously dismissed his FLSA claims, but not his West Virginia state-law claims. For simplicity's sake, as each of the other Named Plaintiffs is a current opt-in, the Parties have agreed to treat him as an opt-in for purposes of the settlement.

## II.    BACKGROUND OF THE LITIGATION AND SETTLEMENT

### a.    The *Danford* action.

The genesis of this case focuses on Plaintiffs' allegations that Lowe's failed to pay certain hourly managers for the following off-the-clock work: (1) Loss Prevention Managers (hereinafter "LP Managers") performing exterior perimeter checks of the stores; (2) Service and Support Managers and Department Supervisors (hereinafter "SSM/DSs") performing store opening and closing duties, as well as other perimeter checks before and after meal breaks and midday shifts; and (3) reading and responding to work-related smartphone communications during non-work hours.

The *Danford* action (*Danford, et al., v. Lowe's Companies, Inc., Lowe's Home Centers, LLC,* Civ. No. 5:19-CV-00041-KDB-DCK) filed on April 11, 2019, asserted the following claims based on those allegations in the name of Named Plaintiff Daniel Danford and on behalf of a putative FLSA collective and putative Rule 23 classes:

Count I:        Violation of FLSA, 29 U.S.C. § 201, *et seq.* Failure to Pay Overtime Wages (Collective Action under the Fair Labor Standards Act)

Count II:       Violations of North Carolina Wage and Hour Act N.C.G.S. §§ 95-25.1, *et seq.*

Count III:      Breach of Contract

Count IV:       Unjust Enrichment

(*Danford* ECF No. 1).[3]

Prior to the filing of the Action, Plaintiffs' Counsel conducted a thorough investigation into the merits of the Named Plaintiffs' (Messrs. Danford and Houtman) allegations. Plaintiffs' Counsel obtained and reviewed documents from the Named Plaintiffs, including pay records, corporate

---

[3] The subsequent First Amended Complaint also included California state-law claims, which were dismissed when Harry Houtman, an early opt-in Plaintiff who worked in California, was dismissed due to an arbitration agreement.  *See Danford* ECF No. 40.

documents, and documents relating to the Named Plaintiffs' job duties. Plaintiffs' Counsel also conducted multiple in-depth interviews of the Named Plaintiffs. (Exh. B, Stoops Decl. at ¶ 13).

In June 2019, Plaintiffs' Counsel filed a comprehensive Pre-Discovery Motion for FLSA Conditional Certification, along with a detailed Notice of the lawsuit. (*Danford* ECF No. 20). Thereafter, Lowe's filed multiple motions, including: an Emergency Motion to Expedite Discovery and Stay Briefing on the conditional certification motion (*Danford* ECF No. 21); a Motion to Compel Arbitration of the claims of one of the then Named Plaintiffs, Harry Houtman (*Danford* ECF No. 22); and a Partial Motion to Dismiss. (*Danford* ECF No. 28). On July 3, 2019 Lowe's filed an Answer to Plaintiffs' Complaint denying all allegations of wrongdoing and liability and asserting 34 affirmative defenses. (*Danford* ECF No. 31). Next, Lowe's filed several supplemental briefs and declarations challenging the factual allegations and legal basis for Plaintiffs' motion for conditional certification. (*Danford* ECF No. 43 and 44).

On September 19, 2019 the Court held oral argument on Plaintiffs' Motion for Conditional Certification. The next day the parties commenced written and oral discovery including the deposition of Named Plaintiff Danford. (Exh. B, Stoops Decl. at ¶ 13).

On October 2, 2019 the Court entered an Order granting Plaintiffs' motion for conditional certification. (*Danford* ECF No. 50). On November 6, 2019, with the assistance of professional notice administrator Simpluris, Inc., Plaintiffs issued conditional FLSA notice to 47,942 putative collective members. (Exh. B, Stoops Decl. at ¶ 21). The FLSA conditional notice opt-in period closed on January 24, 2020. (*Id.* at ¶ 22). In total, approximately 3,900 individuals (8.1%) submitted opt-in consent forms to join the FLSA collective. (*Id.* at ¶ 23). Approximately 1,570 of the original 3,900 opt-ins were subsequently dismissed due to arbitration agreements, untimely claims, and failing to respond to discovery.

4

### b. The MDL.

On January 15, 2020 the Court held a status conference to discuss proposed amendments to the Pretrial Order and Case Management Plan. (*Danford* ECF No. 153). During the status conference, Plaintiffs' Counsel informed the Court and Lowe's that they intended to seek to amend their Complaint to add various wage and hour claims arising under the law of multiple states across the country. (Exh. B, Stoops Decl. at ¶ 24). Lowe's objected to Plaintiffs' Counsel's proposed amendment.

Consequently, during March and April 2020, Plaintiffs' Counsel initiated separate Rule 23 wage and hour actions in various federal courts asserting wage and hour claims arising under the laws of the following states: Arizona, Arkansas, Colorado, Connecticut, Illinois, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York, Ohio, South Carolina, Washington, and West Virginia, as well as a similar state-court action in Pennsylvania, which Lowe's removed to federal court. (*Id.* at ¶ 25). Contemporaneous with Plaintiffs' Counsel's filing of the Rule 23 state law wage and hour actions, Lowe's hired a new law firm, Gibson, Dunn & Crutcher LLP, to represent it in this case and the Rule 23 actions and removed its initial law firm Moore & Van Allen. (*Id.* at ¶ 26).

On May 12, 2020 Lowe's filed a motion before the United States Judicial Panel on Multidistrict Litigation to transfer the Rule 23 state law wage and hour actions for pretrial proceedings pursuant to 28 U.S.C. § 1407. Specifically, Lowe's requested that all of the matters be transferred to Judge Bell in the Western District of North Carolina, who had been presiding over the *Danford* action since its inception. (*Id.* at ¶ 27). On August 5, 2020, following oral argument, the Judicial Panel on Multidistrict Litigation transferred eighteen Rule 23 state law wage and hour actions to this Court (Arizona, Arkansas, Colorado, Connecticut, Illinois, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York,

Ohio, South Carolina, Washington, and West Virginia). (*Id.* at ¶ 28). On August 21, 2020 a tag-along action was also transferred to this Court (*Bowens v. Lowe's Companies, Inc., et al.* (Pennsylvania). (*Id.* at ¶ 29).

### c. Overview of the litigation proceedings prior to settlement.

After transfer of the Rule 23 state wage and hour actions and creation of the MDL, this Court entered a Case Management Order that outlined the discovery limits applicable to the case. The Court's CMO (*Lowe's WHL MDL* ECF No. 13), imposed the following fact discovery limits on Lowe's:

a.  300 opt-in Plaintiffs would be subjected to written discovery (interrogatories; requests for admission; requests for production of documents), including, as needed, replacements for those that failed to respond;

b.  Additional selected opt-in Plaintiffs from each of the 20 Rule 23 states would be subject written discovery (interrogatories; requests for admission; requests for production of documents), such that there would be a minimum of 10 opt-in Plaintiffs from each state who would take part in written discovery (estimated to add approximately 75 opt-in Plaintiffs);

c.  All Named Plaintiffs would be subjected to written discovery;

d.  Lowe's would be allowed to take the deposition of all Named Plaintiffs; depositions of up to 90 opt-in Plaintiffs; and up to 20 additional depositions of non-expert and non-opt-in witnesses.

Additionally, Plaintiffs' Counsel was tasked with filing a consolidated complaint that included all of the continuing claims asserted in the *Danford* action as well as all claims asserted in the Rule 23 state wage and hour actions.[4]

On October 14, 2020 Lowe's filed a Motion to Dismiss pursuant to which it sought dismissal of the majority of Plaintiffs' state law claims as well as dismissal of a number of Named Plaintiffs in their individual capacities (*Lowe's WHL MDL* ECF No. 17). On February 3, 2021 the

---

[4] The consolidated complaint excluded the nationwide putative unjust enrichment and breach of contract claims asserted in *Danford*. *See Lowe's WHL MDL* ECF No. 15.

Court issued an Order granting in part and denying in part Lowe's Motion to Dismiss. (*Lowe's WHL MDL* ECF No. 28). With the exception of Plaintiffs' claims arising under Arizona state law, at least portions of each of Plaintiffs' Rule 23 state law wage and hour actions survived Lowe's Motion to Dismiss. Plaintiffs subsequently filed a Second Amended Consolidated Complaint, which is the operative pleading for the MDL. *See Lowe's WHL MDL ECF* No. 29.

From September 2020 through December 2021, the parties engaged in extensive fact discovery. Among other things:

a.    Lowe's produced approximately 500,000 documents (totaling several million pages) and over 165 gigabytes of data related to payroll and timekeeping records, alarm reports, store schedules, employee schedules, Kronos punch data, and class lists.

b.    Lowe's issued written discovery to over 400 opt-in Plaintiffs (including replacements for those that failed to respond to prior rounds). 275 of these individuals fully responded to the written discovery requests.

c.    23 Named Plaintiffs fully responded to written discovery requests and appeared for depositions.

d.    Lowe's deposed 76 opt-in Plaintiffs.

e.    Plaintiffs issued multiple sets of written discovery to Lowe's.

f.    Plaintiffs conducted:

    i.    2 Rule 30(b)(6) corporate representative depositions;

    ii.    11 Rule 30(b)(6) state specific representative depositions;

    iii.    10 depositions of Lowe's corporate employees; and

    iv.    3 store manager depositions.

(Exh. B, Stoops Decl. at ¶ 35).

Additionally, the parties expended substantial efforts on expert discovery which included initial reports, rebuttal reports, and deposition testimony of the following designated experts: Brian Kriegler, Ph.D. (Plaintiffs' Expert – Statistician/Damages); Lee Miller, J.D. (Plaintiffs' Expert – Human Resource Management/Organizational Culture); Gary White (Plaintiffs' Expert – Retail

Executive Manager/Retail Policies and Procedures); Michael Ward, Ph.D. (Lowe's Expert – Statistician/Damages); Hart Blanton, Ph.D. (Lowe's Expert – *Daubert* challenge to White and Miller reports with respect to accepted academic and social scientific norms and standards). (*Id.* at ¶ 36).

Finally, throughout the time period that the parties were engaged in discovery they took part in dozens of telephonic meet and confers, exchanged hundreds (if not thousands) of e-mails, and engaged in multiple contested motions related to, among other things: alleged discovery deficiencies; modifications to the CMO; Lowe's privilege designations; substitution of Named Plaintiffs; dismissal of non-responsive opt-in Plaintiffs; and compulsion of opt-ins to arbitration. (*Id.* at ¶ 37).

### d. Arbitration proceedings.

After the close of the FLSA opt-in period, Lowe's sought to dismiss hundreds of opt-in Plaintiffs pursuant to arbitration agreements. As a part of this stipulated process, Plaintiffs' Counsel was required to review/analyze over 1,000 arbitration agreements to determine their enforceability and application. (*Id.* at ¶ 38). Ultimately, 1,039 opt-in Plaintiffs were dismissed to arbitration: 944 by stipulation and 95 as a result of motion practice. (*Id.* at ¶ 39). 236 of the dismissed opt-in Plaintiffs retained Plaintiffs' Counsel to initiate individual arbitrations on their behalf. (*Id.* at ¶ 40).

Prior to settlement of this action, 11 of the arbitrations proceeded to hearing. Plaintiffs' Counsel prevailed in part in 5 of those arbitration proceedings; Lowe's fully prevailed in the other 6 arbitration proceedings. None of the arbitrators ruled in favor of the arbitration claimants' smartphone communication claims. (*Id.* at ¶ 41). An additional 12 arbitration proceedings were settled by the Parties prior to a final hearing on the merits. A number of other arbitration proceedings were voluntarily dismissed by the arbitration claimants. (*Id.* at ¶ 42). At the time of

settlement, 188 arbitration proceedings remained in litigation. (*Id.* at ¶ 43).

   **e.**  **Mediation.**

   The Parties conducted their first mediation on September 29, 2021 with esteemed wage and hour mediator Linda Singer (Washington, D.C.). (*Id.* at ¶ 44). After a full day of a contentious mediation, the Parties were unable to reach a resolution and determined the best course was to push forward with fact and expert discovery. (*Id.* at ¶ 45).

   In November 2021, with substantial fact and expert discovery ongoing as well as looming class certification motion deadlines, the Parties began discussing the parameters of a second mediation. (*Id.* at ¶ 46). After lengthy discussion that extended several weeks, the Parties determined that a second mediation was in the best interests of their clients and chose to enlist the services of Lee Parks (Atlanta) to serve as mediator. (*Id.* at ¶ 47).

   The second mediation took place on December 9, 2021. Despite their best efforts in a full day, contentious mediation, the Parties were unable to reach resolution. (*Id.* at ¶ 48). Mr. Parks, who has national recognition for his mediation skills, would not let the Parties walk away from the negotiation and expended substantial efforts during the month of December (including several hours spent on telephone calls, e-mails, and text communications) bringing the Parties closer to settlement. (*Id.* at ¶ 49). Ultimately, on December 31, 2021, the Parties reached a settlement addressing both the MDL and the arbitrations, the former of which is before the Court today. (*Id.* at ¶ 50). The parties spent the next several months working on the long form Settlement Agreement now before the Court, and obtaining signed releases from the Named Plaintiffs. Once the parties finalized the Settlement Agreement, the corresponding settlement approval briefing began. (*Id.* at ¶ 51).

   At all times, the parties' settlement negotiations have been non-collusive, adversarial, and at arm's length. (*Id.* at ¶ 52).

###### f.    Settlement terms.

The $7,452,008.18 settlement resolving *Danford* and the Rule 23 class actions is the subject of the instant Motion for Settlement Approval, consisting of $2,074,150 to the 2,390 opt-in Plaintiffs (including $142,350 for incentive awards); $25,850 to the settlement administrator; and $5,352,008.18 to Plaintiffs' Counsel for fees and litigation expenses.[5]

The Parties' Settlement Agreement, attached hereto as Exhibit A, identifies each of the 2,390 opt-in Plaintiffs covered by the Settlement, including the Named Plaintiffs in the Rule 23 actions. (Exh. A at Exhibit A).

Individual settlement amounts totaling $1,931,800 shall be paid to the 2,390 opt-in Plaintiffs as follows:

1. One Million One Hundred Thirty-Two Thousand Six Hundred Forty-Five Dollars and Seventy-Seven Cents ($1,132,645.77) to be paid to the 1,402 FLSA Opt-Ins who held Service and Support Manager or Department Supervisor positions[6] (hereinafter "SSM/DSs") during the relevant time period (as indicated in Exhibit A).  This amount shall be known as the SSM/DS Net Settlement Fund.

   a. Individual Settlement Amounts will be paid to each of the SSM/DSs from the SSM/DS Net Settlement Amount and shall be paid pursuant to the settlement formula set forth herein. The Settlement Administrator will calculate the total amount that each of the SSM/DSs will receive.  The Settlement Administrator will divide the SSM/DS Net Settlement Fund by the total number of work weeks the SSM/DSs were employed in SSM/DS positions between October 2, 2016 and March 1, 2022 ("SSM/DS Work Week Amount").  The Settlement Administrator will multiply the SSM/DS Work Week Amount by the total number of work weeks that each SSM/DS was employed between October 2, 2016 and March 1, 2022 to calculate each SSM/DS's Individual Settlement Amount.

2. Seven Hundred Thirty-Nine Thousand Eight Hundred Twenty-Nine Dollars and Twenty-Three Cents ($739,829.23) to be paid to the 218 FLSA Opt-Ins who held Loss Prevention Manager

---

[5] $992,754.30 of this amount represents reimbursement for litigation expenses. The remaining $4,359,253.88 will be used for payment of Plaintiffs' Counsel's attorneys' fees which exceed $4,650,000 (not including attorneys' fees exceeding $411,000 that were incurred by Plaintiffs' Counsel and retained local counsel in connection with the state law cases that were subsequently consolidated by way of the MDL).

[6] Consisting of the following job titles: Back-End Department Supervisor; Front-End Department Supervisor; Night Ops Department Supervisor; Sales Floor Department Supervisor; Service Manager; Support Manager; and Temporary Service Manager.

positions[7] during the relevant time period (hereinafter "LPMs") (as indicated in Exhibit A). This amount shall be known as the LPM Net Settlement Fund.

    b. Individual Settlement Amounts will be paid to each of the LPMs from the LPM Net Settlement Amount and shall be paid pursuant to the settlement formula set forth herein. The Settlement Administrator will calculate the total amount that each of the LPMs will receive. The Settlement Administrator will divide the LPM Net Settlement Fund by the total number of work weeks the LPMs were employed in LPM positions between October 2, 2016 and March 1, 2022 ("LPM Work Week Amount"). The Settlement Administrator will multiply the LPM Pay Period Amount by the total number of work weeks that each LPM was employed between October 2, 2016 and March 1, 2022 to calculate each LPM's Individual Settlement Amount.

3. Fifty Nine Thousand Three Hundred Twenty-Five Dollars and Zero Cents ($59,325.00) to be paid to the 791 FLSA Opt-Ins who did not hold SSM/DS or LPM positions between October 2, 2016 and March 1, 2022 and are only entitled to alleged smartphone communication damages (hereinafter "Smartphone Opt-Ins") (as indicated in Exhibit A). This amount shall be known as the Smartphone Opt-In Net Settlement Fund. Each Smartphone Opt-In shall be paid Seventy-Five Dollars and Zero Cents ($75.00) from the Smartphone Opt-In Net Settlement Fund.

(Exh. A at § 2.4(iii) (pages 5-7)).

    The Individual Settlement Amount for each FLSA Opt-In shall be allocated as follows: fifty percent (50%) as wages, for which the Settlement Administrator will issue IRS Form W-2s and any similar required state tax forms; and fifty percent (50%) as liquidated damages, penalties and/or interest, for which the Settlement Administrator will issue IRS Form 1099s and any similar required state tax forms. Incentive Awards, where issued, shall be reported on the Form 1099s and similar state forms. (*Id.* at § 2.4(iii)(c) (page 7)).

    $142,350.00 shall be allocated as Incentive Awards as follows:

1. Forty-Six Thousand Dollars and Zero Cents ($46,000.00) to be distributed equally (Two Thousand Dollars and Zero Cents ($2,000.00) each) to the Named Plaintiffs.

2. Sixty-Six Thousand Five Hundred Fifty Dollars and Zero Cents ($66,550.00) to be distributed equally (Eight Hundred Seventy-Five Dollars and Zero Cents ($875.00) each) to the 76 FLSA Opt-Ins (other than Named Plaintiffs) who were deposed and participated in written discovery and have not been dismissed from the Action. Said FLSA Opt-Ins are indicated on Exhibit A.

---

[7] Consisting of the following job titles: Asset Protection & Safety Manager; Department Manager Loss Prevention & Safety; and Loss Prevention and Safety Manager.

11

3. Twenty-Nine Thousand Eight Hundred and Fifty Dollars and Zero Cents ($29,850.00) to be distributed equally (One Hundred Fifty Dollars and Zero Cents ($150.00) each) to the 199 FLSA Opt-Ins who participated in written discovery but did not sit for a deposition and have not been dismissed from the Action. Said FLSA Opt-Ins are indicated on Exhibit A.

(*Id.* at § 2.4(ii) (page 5)).

Additional material terms in the Settlement Agreement include the following:

- Any amount of disallowed Incentive Awards will be redistributed among the opt-in Plaintiffs on a pro-rata basis. (*Id.* at § 2.4(iii)(b) (page 7)).

- Any amount of the $5,352,008.18 sought by Plaintiffs' Counsel for attorneys' fees and litigation expenses that is disallowed will be redistributed among the opt-in Plaintiffs on a pro-rata basis or distributed to a *cy pres* beneficiary designated by the Court. (*Id.* at § 2.5(b) (page 7)).

- None of the amounts paid by Lowe's to fund the settlement will revert to Lowe's. (*Id.* at § 2.7 (page 7)).

- The opt-in Plaintiffs are not required to submit a claim form or other documentation of their claim in order to receive payment of their Individual Settlement Amount or any Incentive Award. Named Plaintiffs, however, must execute an individual release as provided for herein in order to receive their Individual Settlement Amount and Incentive Award. (*Id.* at § 5.3 (page 11)).

- Individual settlement amounts and incentive awards will be paid to the opt-in Plaintiffs within 30 days of the effective date of the Court's approval order. (*Id.* at § 5.4 (page 11)).

- The opt-in Plaintiffs will be allowed 150 days to redeem their individual settlement amounts. Unclaimed proceeds will be redistributed to the opt-in Plaintiffs if said proceeds exceed $25,000 on a pro-rata basis. Any other unclaimed funds will be remitted to the state unclaimed property fund for the state in which the opt-in Plaintiff resided. (*Id.* at § 5.6 (page 12)).

- The opt-in Plaintiffs each agree to fully and forever discharge and release each and every one of the Lowe's Releasees from any and all claims, actions, demands, causes of action, suits, debts, obligations, damages, rights or liabilities, of any nature and description whatsoever, that (x) accrued between October 2, 2016 and March 1, 2022, and (y) are based on or reasonably related to the claims asserted in the Action, and specifically for unpaid wages (including claims for regular wages, overtime, regular rate calculations, and gap time) under the FLSA and under laws of the state(s) in which they worked for Lowe's. (*Id.* at § 3.2 (page 8)).

- The Named Plaintiffs each agreed to a general release of the Lowe's Releasees from any and all claims that they have or may have against the Lowe's Releasees, whether known

or unknown, including, but not limited to, all claims that were or could have been asserted in the Action. (*Id.* at § 3.3 (pages 8-9)). Additionally, the Named Plaintiffs agreed to dismiss their pending Putative State Law Class Claims *without prejudice*, and their respective individual state law claims *with prejudice*, resulting in dismissal of each state-law action in its entirety. (*Id.* at § 3.1 (page 8)).

g.      **Reasonableness of Settlement.**

The complexities that the Parties encountered in reaching this settlement were significant, to say the least. (Exh. B, Stoops Decl. at ¶ 67). Among other things, the Parties experienced numerous complications related to how to structure the settlement including identification of the allegedly compensable off-the-clock time, extensive review of substantial testimonial, document and data production, and substantial legal research. (*Id.* at ¶ 68). Counsel for both Parties demonstrated substantial effort, expertise, dedication and creativeness in making sure that the current settlement was fair, reasonable and adequate to both sides. Had all those efforts not occurred, and the hurdles and obstacles overcome, this case, and the collective wide settlement, would never have been reached. (*Id.*).

Furthermore, Lowe's asserted numerous legal and factual defenses to Plaintiffs' claims and collective/class certification efforts including, among others, that:

a.      Lowe's had no knowledge of the hourly managers' off-the-clock work.

b.      Lowe's time and alarm records do not support the allegation that certain FLSA opt-ins performed opening and closing duties and/or perimeter checks.

c.      Lowe's maintains a "punch decline" function in its Kronos timekeeping system that the opt-in Plaintiffs were supposed to utilize to record (and be compensated for) any work performed off-the-clock. By way of this function Lowe's acted with reasonable diligence to ensure that the employees were compensated for all work performed. Hourly managers were required to complete extensive training related to the punch decline process and other timekeeping obligations. Further, the hourly managers often demonstrated that they knew how to use the declined punch process.

d.      The hourly managers are estopped from asserting claims for off-the-clock work where they failed to follow Lowe's decline a punch policies in connection with off-the-clock work. By failing to follow the reasonable policies, they prevented Lowe's from knowing about the work.

e.  Lowe's maintains written employment policies pursuant to which employees are expected not to perform work off-the-clock. Furthermore, the employees are not permitted to work overtime without prior authorization.

f.  The opt-in Plaintiffs were not assigned to, and in fact did not, perform the off-the-clock work alleged. Instead, the alleged off-the-clock work was ordinarily performed by exempt salaried managers. The hourly managers signed acknowledgements that they had read and understood these policies.

g.  The opt-in Plaintiffs performed aspects of the alleged off-the-clock work in various ways across Lowe's 1,700 stores (many of which differ in size and layout).

h.  The putative Class/Collective Members engaged in personal activities at the beginning of their shifts. Similarly, on perimeter checks, hourly managers were instructed to simply wait in their vehicle while a salaried manager performed the perimeter checks, and the hourly manager was free to play on their phones, etc.

i.  The opt-in Plaintiffs' allegations as to the amount of off-the-clock time worked grossly overstates how long it takes to perform the tasks they describe.

j.  The opt-in Plaintiffs will not be able to prove their off-the-clock time because no records exist identifying the exact amount of time they spent each shift performing the off-the-clock duties.

k.  Some of the workweeks during which the opt-in Plaintiffs allege to have performed off-the-clock work were not workweeks in which they worked 40 or more hours and, thus, the opt-in Plaintiffs cannot maintain actionable FLSA claims for those workweeks.

l.  The alleged off-the-clock work the opt-in Plaintiffs performed is not compensable as a matter of law including under the preliminary/postliminary doctrine of the Portal to Portal Act.

m.  The putative Class/Collective Members will not satisfy the commonality and predominance elements required for Rule 23 certification.

n.  The putative Collective will not satisfy the requirements for final certification under the FLSA.

o.  The putative Class/Collective Members' claims fail because the alleged off-the-clock time is *de minimis*.

p.  The opt-in Plaintiffs will not be able to establish that Lowe's alleged violations were willful.

q.  Plaintiffs and the putative Class/Collective Members will not be able to recover liquidated damages.

r.  Lowe's hourly managers' use of WhatsApp or GroupMe was completely voluntary and, if used, was typically not work related and not reported/recorded by the hourly managers in any event. (*Id.* at ¶ 69).

14

Lowe's factual and legal arguments (many of which were successful in the related arbitrations) weighed on the parties' decision to resolve the case. While Plaintiffs' Counsel understandably takes issue with the viability of some of these defenses, the risks associated with the continued litigation of the opt-in Plaintiffs' wage claims simply cannot be disregarded in measuring the reasonableness of the settlement. Specifically, settling this case now saves the parties from years of litigation and tremendous uncertainty as to the ultimate outcome of the litigation. Should the parties have continued to litigate the case, they would have been faced with several months of Rule 23 certification motions on Plaintiffs' multiple state law claims, FLSA conditional certification and decertification motions, expert-related briefing, numerous dispositive motions, and eventually one or more trials (potentially in numerous courts across the country once MDL pretrial proceedings were complete). It is very likely that this litigation would extend for another one to two years and cost the Parties amounts well exceeding $1,000,000 in attorneys' fees and expenses. (*Id.* at ¶ 70). Further, Plaintiff's Counsel concluded that it was not likely that the Court would grant certification of the 19 putative state law classes, which constitute a substantial portion of the overall claims and potential recovery.

Plaintiffs' Counsel retained Brian Kriegler, Ph.D. (Plaintiffs' Expert – Statistician/Damages) to prepare a damage analysis/report. Dr. Kriegler, with Plaintiffs' Counsel's assistance, prepared a time consuming and complicated damage analysis of those claims in the operative Complaint that Plaintiffs' Counsel believed were still viable. Among other things, Plaintiffs' Counsel and Dr. Kriegler:

a.    Reviewed and analyzed over 165 gigabytes of data and thousands of pages of documents related to payroll and timekeeping records, alarm reports, store schedules, employee schedules, Kronos punch data, and class lists.

b.    Reviewed and analyzed opt-in Plaintiff metrics related to: rate of pay; hours worked; employment periods; weeks worked.

15

c.      Reviewed and analyzed Kronos punch/decline records to determine the frequency of compensation for the alleged off-the-clock work.

d.      Reviewed and analyzed Kronos punch/decline records to determine the amount of time Defendant compensated employees for opening and closing duties subsequent to the September 14, 2020 Kronos enhancement.

e.      Reviewed and analyzed over 100 depositions and over 300 sets of written discovery to determine the amount of time worked by the Named and opt-in Plaintiffs in connection with the alleged off-the-clock work.

f.      After taking into account the applicable statute of limitations for each of the claims asserted in the litigation, computed the amount of damages, penalties and interest that could be sought by the Named Plaintiffs and the opt-in Plaintiffs. (*Id.* at ¶ 71).

Additionally, one of Dr. Kriegler's primary objectives was to determine which of the following claim "buckets" each of the Named and opt-in Plaintiffs fell into based on their job titles and duties: 1) employees who allegedly performed opening and closing duties without compensation; 2) employees who allegedly performed loss prevention exterior perimeter sweeps before and after their shifts and during their meal periods without compensation, and 3) employees who only allegedly engaged in off-the-clock smartphone communications without compensation. (*Id.* at ¶ 72). Finally, Dr. Kriegler was tasked with identifying the number of shifts that each opt-in Plaintiff allegedly performed opening and closing duties without compensation, and the number of shifts that each opt-in Plaintiff allegedly performed loss prevention exterior perimeter sweeps before and after their shifts and during their meal periods without compensation. (*Id.* at ¶ 73). He did not assess certain types of work alleged in the Complaint, including interrupted meal breaks; SSM/DS perimeter checks aside from before opening shifts and after closing shifts (*i.e.,* before and after mid-day shifts and meal breaks); and any perimeter checks by other categories of hourly managers, including Department Managers, Installed Sales Managers, and Merchandising Sales Managers.

Based on Dr. Kriegler's analysis, the discovery conducted by the Parties, and the information exchanged by the Parties during mediation, Plaintiffs' Counsel identified the damages

that they reasonably believed could be recovered on behalf of the opt-in Plaintiffs for the three remaining core claims in the litigation:

a. <u>SSM/DS Damages (Opening and Closing Duties)</u>:

Plaintiffs determined that, notwithstanding the more extensive allegations in the Complaint and discovery responses, the range of recovery for the opening and closing duties performed by the 1,402 opt-in Plaintiffs who held SSM/DS positions equated to 5 to 10 minutes of compensation per each opening and closing shift (i.e. shifts where the opt-in Plaintiffs performed the alleged opening and closing duties).[8]

Based on the number of identified opening and closing shifts, and assuming that each opt-in Plaintiff was paid the full measure of damages for each minute worked (at straight time rate in weeks not already in overtime, and overtime rate in other weeks), the recovery for the period ending May 1, 2021 (end point of analyzed data) for these 1,402 opt-in Plaintiffs would fall in a range of $351,485.38 (5 minutes/shift) to $702,970.77 (10 minutes/shift). Applying FLSA liquidated damages, the potential range of recovery for that period would equal $702,970.76 (5 minutes/shift) to $1,405,941.54 (10 minutes/shift). Extrapolating from that period to cover through March 1, 2022 would result in a range (with liquidated damages) of **$864,654.02 to $1,729,308.08**.

b. <u>Loss Prevention Manager Damages (Exterior Perimeter Sweeps)</u>:

Plaintiffs determined that, notwithstanding the more extensive allegations in the Complaint and discovery responses, the range of recovery for the loss prevention exterior perimeter sweeps performed by the 218 opt-in Plaintiffs who held LP Manager positions equated to 8 to 12 minutes of compensation per shift.

Based on the number of identified applicable shifts, and assuming that each opt-in Plaintiff was paid the full measure of damages for each minute worked (full hourly rate for straight time, and overtime rate for overtime), recovery for the period ending May 1, 2021 (end point of analyzed data) for these 218 opt-in Plaintiffs would fall in a range of $256,052.80 (8 minutes/shift) to $384,079.20 (12 minutes/shift). Applying FLSA liquidated damages, the potential range of recovery would equal $512,105.60 (8 minutes/shift) to $768,158.40 (12 minutes/shift). Extrapolating from that period to cover through early 2022 would result in a range (with liquidated damages) of **$629,889.88 to $944,834.82**.

---

[8] A small number of opt-in Plaintiffs held both SSM/DS positions *and* LP Manager positions at different times in the relevant period. They are eligible to receive payments in both categories based on the relevant number of work-weeks in each position. Thus, the subtotals in these paragraphs do not add up to 2,390.

c. <u>Smartphone Communications:</u>

At all times through the litigation, Defendant disputed the validity of Plaintiffs' claims related to alleged off-the-clock smartphone communications. Additionally, Plaintiffs' were unable to discover any corporate-wide policy, practice or directive, that required the opt-in Plaintiffs to engage in off-the-clock smartphone communications. Furthermore, the opt-in Plaintiffs provided disparate testimony concerning the performance of the work related off-the-clock smartphone communications and were in large part unable to produce written records of said communications. Finally, not a single arbitrator (11 arbitrations proceeded to hearing) ruled in favor of the arbitration claimant on such claims.

Based on the totality of these circumstances, the Parties determined that the 791 opt-in Plaintiffs who did not hold SSM/DS or LP Manager positions (and thus did not perform opening/closing duties or loss prevention exterior perimeter sweeps), are not legally entitled to any compensation for alleged unpaid wages. (*Id.* at ¶ 74).

Based on the damage analysis conducted by Plaintiffs' Counsel and expert, and in light of the factual and legal defenses identified above, the $1,132,645.77 net settlement pool that will be paid to the 1,402 opt-in Plaintiffs who allegedly performed opening and closing duties equates to approximately 65.49% (assuming a recovery of $1,729,308.08 based on Plaintiffs' reduced maximum estimate of 10 (not 15) minutes per shift) to 130.9% (assuming a recovery of $864,654.02 based on 5 minutes per shift) of Lowe's off-the-clock wage claim exposure (with inclusion of liquidated damages) for the opening and closing duties. (*Id.* at ¶ 75). That calculation excludes damages for other types of work by SSM/DSs alleged in the Complaint, as outlined above.

Based on the damage analysis conducted by Plaintiffs' Counsel and expert, and in light of the factual and legal defenses identified above, the $739,829.23 net settlement pool that will be paid to the 218 opt-in Plaintiffs who performed loss prevention exterior perimeter sweeps equates to approximately 78.39% (assuming a recovery of $944,834.82 based on Plaintiffs' reduced maximum estimate of 12 minutes per shift) to 117.45% (assuming a recovery of $629,889.88 based on 8 minutes per shift) of Lowe's off-the-clock wage claim exposure (with inclusion of liquidated damages) for the exterior perimeter sweeps. (*Id.* at ¶ 76). That calculation excludes damages for other types of work alleged in the Complaint by LP Managers, as outlined above.

Additionally, despite not being entitled to any unpaid wages for the claims asserted in this litigation (notwithstanding the allegations in the Complaint), the Settlement provides for payments of $75 each (totaling $59,325) to the 791 opt-in Plaintiffs who were neither SSM/DSs or LP Managers, and thus only performed alleged off-the-clock smartphone communications. (*Id.* at ¶ 77).

Further, the total $2,074,150 net settlement (the amount that will be paid to opt-in Plaintiffs for wage claims and incentive awards) equates to approximately 77.56% of Lowe's greatest possible FLSA exposure of $2,674,142.90, including liquidated damages, after accounting for the narrowing of alleged claims and damages based on Plaintiffs' counsel's assessment of the evidence.(*Id.* at ¶ 78). Moreover, the settlement does not burden the opt-in Plaintiffs with their proportional share of the substantial litigation expenses and attorneys' fees Plaintiffs' Counsel incurred in litigating this matter – all of which will be paid by Lowe's in addition to the net settlement amount, including opt-in Plaintiff settlement pools, described above. (*Id.* at ¶ 79). As such, the settlement amount is substantial, completely reasonable, and marks a fair compromise of the claims. (*Id.* at ¶ 80).

The proposed releases by the Named and opt-in Plaintiffs were extensively scrutinized and negotiated by the attorneys involved in this litigation. They represent a fair compromise and constitute a fair negotiated bargain for release of claims that arise from the facts as alleged in this litigation. Each of the Named Plaintiffs have signed individual releases, consented to the settlement agreement, and have been afforded full access to Plaintiffs' Counsel. (*Id.* at ¶ 81).

This settlement was the result of arm's-length negotiations, with assistance by esteemed and very experienced mediator Lee Parks, conducted by experienced counsel for all parties, and reached after extensive discovery and contested litigation. Prior to settlement, each side independently and thoroughly investigated the claims and defenses at issue. The work performed

allowed each party to intelligently, and in good faith, weigh both the risks and benefits of settlement as compared to continued litigation. These efforts culminated in a substantial settlement which provides the opt-in Plaintiffs with an opportunity to resolve their claims against Lowe's in a meaningful way. (*Id.* at ¶ 82). Neither Plaintiffs' Counsel or the Named Plaintiffs, have any conflict with one another or with the opt-in Plaintiffs. (*Id.* at ¶ 83).

Plaintiffs' Counsel fully endorses the settlement and believe that it is truly in the best interests of all parties. (*Id.* at ¶ 84).

### h. Modification of Lowe's compensation policies.

In addition to the monetary value of the settlement, this litigation has spurred substantial change to Lowe's compensation policies and practices across its over 1,700 stores nationwide.

Specifically, on September 14, 2020 Lowe's modified its Kronos timekeeping system to provide pop-up questions and comment fields to the Department Supervisors responsible for performing opening and closing duties in which the Department Supervisors are expressly asked whether they performed off-the-clock work in connection with opening and closing duties and are then directed to insert the amount of time they spent in connection with the off-the-clock work. (*Id.* at ¶ 86). Lowe's Workforce Management Manager, Thomas Dhen, acknowledged at his deposition that the Kronos timekeeping modification – and resulting payment of wages to hourly managers for opening and closing duties – was implemented in direct response to the allegations raised in the *Danford* action. (*Id.* at ¶ 87).

Additionally, within months of initiation of the *Danford* action in April 2019 Lowe's issued multiple communications nationwide instructing its District Managers, Store Managers, and Assistant Managers, to cease and discontinue from off-the-clock smart phone communications with hourly managers. (*Id.* at ¶ 88). Discovery showed that these efforts were effective.

Based on the analysis conducted by Plaintiffs' expert damage analyst, the September 14,

2020 Kronos modification was effective in capturing previously uncaptured time, and has resulted in hundreds of thousands of dollars in additional compensation to Lowe's hourly managers nationwide since the change was implemented. (*Id.* at ¶ 89).

### III. ARGUMENT

#### a. Judicial review of FLSA settlements.

District courts within the Fourth Circuit repeatedly explain that FLSA settlements must be judicially approved for fairness. *See Kirkpatrick v. Cardinal Innovations Healthcare Solutions*, 352 F. Supp. 3d 499, 502 (M.D.N.C. 2018); *Duprey v. The Scotts Company LLC*, 30 F. Supp. 3d 404, 407-08 (D. Md. 2014); *Patel v. Barot*, 15 F. Supp. 3d 648, 653-54 (E.D. Va. 2014). Where – as here – a collective FLSA action is settled on behalf of opt-in plaintiffs who already have joined the action, Federal Rule of Civil Procedure 23's class action notice protocols do not apply because the Rule 23 classes have not been certified and the class claims will be dismissed by the various Named Plaintiffs without prejudice, and without certification of settlement classes under Rule 23(e). Accordingly, the FLSA settlement can be reviewed in a single step without a separate preliminary approval order. *See Haskett v. Uber Technologies, Inc.*, 780 Fed. Appx. 25, 27-28 (4th Cir. 2019); *Beasley v. Custom Communications, Inc.*, 2017 U.S. Dist. LEXIS 219975, *4 n. 2 (E.D.N.C. Oct. 24, 2017).

Although the FLSA does not require notice to the Opt-Ins, and Rule 23 does not require notice to the unnamed members of the putative Rule 23 classes (which will remain uncertified), the Class Action Fairness Act (CAFA) can be read as requiring notice of the settlement to the attorneys general of the states for which state-law Rule 23 actions will be dismissed, as well as to the United States Department of Justice. Under 28 U.S.C. § 1715, those officials are afforded 90 days' notice to review the settlement, although "[m]ost courts have concluded that government officials notified of settlements under CAFA have neither standing to object to the settlement nor

the right to intervene in the settlement under Rule 24(a)." 3 *Newberg on Class Actions* § 8:18 (5th ed.). The Parties do not believe that this notice provision was intended to apply in the present circumstances, where the only members of the putative classes releasing claims are Named Plaintiffs and other FLSA Opt-Ins who have each specifically opted to join, and be bound by, the outcome of the litigation. Given the provision's wording, however, the present agreement could nonetheless be regarded as a covered "proposed settlement" because it is an "agreement regarding a class action," is "subject" in part to "court approval" due to the FLSA approval requirements, and is binding "on some or all class members" (*i.e.*, the Named Plaintiffs and those Opt-Ins from those states). 28 U.S.C. § 1711(6). There is no case law addressing this issue, and thus failure to comply with the notice requirements could mean an opt-in Plaintiff who is a member of one of the Rule 23 classes could "refuse to comply with and … choose not to be bound by" the settlement. 28 U.S.C. § 1715(e)(1). Thus, in order to ensure the efficacy of the settlement, Lowe's intends to provide the requisite notices within 10 days of the filing of this Motion, and the Parties request that the Court withhold final approval of the settlement until the 90-day period has lapsed.

Moving past the CAFA notice requirement, collective FLSA settlements should be approved if the Court determines that: "(1) FLSA issues are actually in dispute; (2) the proposed settlement to those issues is fair and reasonable in light of relevant factors from Rule 23; and (3) the proposed attorneys' fees are reasonable." *Thaxton v. Bojangles' Restaurants, Inc.*, 2020 U.S. Dist. LEXIS 225834, *5 (W.D.N.C. Mar. 4, 2020) (citing *Duprey*, 30 F. Supp. 3d at 408); *see, e.g.*, *Nix v. Adams Beverages of North Carolina, LLC*, 2021 U.S. Dist. LEXIS 73333 (W.D.N.C. Apr. 16, 2021). As discussed below, each of these requirements is satisfied:

      **b.**    **FLSA issues are actually in dispute.**

The requirement that "FLSA issues are actually in dispute" is easily satisfied. As reflected in the Parties' various filings and as summarized at pages 12-13 *supra*, the parties sharply disagree

regarding the viability of Plaintiffs' FLSA wage claims including, among other things: 1) whether the opt-in Plaintiffs' actually performed compensable off-the-clock work; 2) whether Lowe's had knowledge of the off-the-clock work; 3) whether the opt-in Plaintiffs were estopped from seeking payment for the off-the-clock work because Lowe's acted with reasonable diligence in capturing the off-the-clock work through its Kronos punch/decline system; 4) whether the opt-in Plaintiffs' claims fail under the *de minimis* doctrine; and 5) the amount of alleged off-the-clock work actually performed. In fact, the Agreement explicitly provides that Lowe's has settled this lawsuit without admitting to any liability. (Exh. A at § 2.1).

### c. The settlement is "fair and reasonable."

In determining whether the settlement is "fair and reasonable," North Carolina district courts repeatedly view the settlement against the same factors utilized in reviewing Rule 23 class action settlements. These factors include:

> (1) the extent of discovery that has taken place;
> (2) the stage of the proceedings, including the complexity, expense and likely duration of the litigation;
> (3) the absence of fraud or collusion in the settlement;
> (4) the experience of counsel who have represented the plaintiffs;
> (5) the probability of plaintiffs' success on the merits    and
> (6) the amount of the settlement in relation to the potential recovery.

*Kirkpatrick v. Cardinal Innovations Healthcare Solutions*, 352 F. Supp. 3d 499, 502-03 (M.D.N.C. 2018); *see, e.g.*, *Dickey v. R.R. Donnelley & Sons, Co.*, 2021 WL 1169245, 2021 U.S. Dist. LEXIS 57981, *5-6 (M.D.N.C. Mar. 26, 2021); *Thaxton*, 2020 U.S. Dist. LEXIS 225834, at *6; *Beasley*, 2017 U.S. Dist. LEXIS 219975, at *5-6.

In considering these factors, courts remain mindful of the "strong presumption in favor of finding a settlement fair." *Kirkpatrick*, 352 F. Supp. 2d at 503 (internal quotations omitted).

Here, each of the factors supports a finding that the settlement is "fair and reasonable":

<u>*Factor 1 – Extent of Discovery*</u>:  This factor favors approval because, as discussed at page 14 *supra*, discovery has been extensive.

*Factor 2 – Stage of the Proceedings, Including the Complexity, Expense and Likely Duration of the Litigation*: This factor favors approval because, absent settlement, the FLSA claims may have survived decertification (although the Rule 23 claims may not have been certified), leading to a collective jury trial that would last several weeks, would require parties and witnesses to travel to Charlotte from throughout the United States, and would require the Court to resolve competing proposals regarding, *inter alia*, the appropriate scope of "representative" trial evidence. *See generally Stillman v. Staples, Inc.*, 2009 WL 1437817, 2009 U.S. Dist. LEXIS 42247, \*52-77 (D.N.J. May 15, 2009) (discussing and analyzing representative testimony in context of FLSA collective trial). Also, the Court would be required to resolve the parties' anticipated *Daubert* challenges to expert testimony and numerous *in limine* motions. Finally, numerous important issues might need to be bifurcated from the initial trial and decided at a later stage.

*Factor 3 – Absence of Fraud or Collusion*: This factor favors approval because the settlement was overseen by an experienced mediator after the completion of extensive discovery and adversarial motion practice. *See generally* pp. 7-8, 14, 17 *supra*.

*Factor 4 – Experience of Plaintiffs' Counsel*: This factor favors approval because both Plaintiffs' Counsel and counsel for Lowe's are experienced counsel with substantial experience litigating employment rights lawsuits in the federal courts.

*Factor 5 – Probability of Plaintiffs' Success on the Merits*: This factor favors approval because, although Plaintiffs believe they could obtain final FLSA certification and prevail at trial under that statute, Lowe's feels equally strongly about Plaintiffs' challenges in proving their claims as well as Lowe's defenses. As summarized at pages 12-13 *supra*, Plaintiffs could not prevail without defeating several independent defenses that Lowe's was poised to raise at trial (many of which Lowe's has been successful on at arbitration).

*Factor 6 – Amount of the Settlement in Relation to the Potential Recovery:*  This factor favors approval because, when viewed against the various litigation risks, the settlement delivers a substantial result to Plaintiffs. As discussed at pages 16-17 *supra*, the $1,132,645.77 net settlement pool that will be paid to the 1,402 opt-in Plaintiffs who performed opening and closing duties equates to approximately 65.49% (assuming a recovery of $1,729,308.08 based on Plaintiffs' reduced maximum estimate of 10 (versus 15) minutes per shift) to 130.9% (assuming a recovery of $864,654.02 based on 5 minutes per shift) of Lowe's FLSA exposure for those claims. Further, the $739,829.23 net settlement pool that will be paid to the 218 opt-in Plaintiffs who performed loss prevention exterior perimeter sweeps equates to approximately 78.39% (assuming a recovery of $944,834.82 based on Plaintiffs' reduced maximum estimate of 12 minutes per shift) to 117.45% (assuming a recovery of $629,889.88 based on 8 minutes per shift) of Lowe's of off-the-clock wage claim exposure (with inclusion of liquidated damages) for the exterior perimeter sweeps. Additionally, despite not being entitled to any unpaid wages for the claims asserted in this litigation, the Settlement provides for payments of $75 each (totaling $59,325) to the 791 opt-in Plaintiffs who, as a function of their positions and titles, only performed alleged off-the-clock smartphone communications—not opening or closing duties or perimeter checks as originally alleged.

Moreover, the total $2,074,150 net settlement (amount that will be paid to opt-in Plaintiffs for wage claims and incentive awards) equates to approximately 77.56% of Lowe's greatest possible FLSA exposure of $2,674,142.90 based on Plaintiffs' counsel's current assessment of the claims, after excluding various categories of previously alleged compensable work and reducing time estimates for other categories. . (*Id.* at ¶ 78). Finally, the settlement does not burden the opt-in Plaintiffs with their proportional share of the substantial litigation expenses and attorneys' fees Plaintiffs' Counsel incurred in litigating this matter – all of which will be paid by Lowe's in

addition to the net settlement amount and opt-in Plaintiff settlement pools described above.

*Summary*:  In sum, each of the six pertinent factors demonstrate that the settlement is "fair and reasonable."

### d.    Plaintiffs' Counsel's attorney's fees are reasonable.

The third requirement to be considered by the Court is the reasonableness of the fees to be recovered by Plaintiffs' Counsel.  As previously noted, Plaintiffs' Counsel seek a fee of $4,359,253.88 (not counting litigation expenses).  In the settlement, the Parties further agreed that should the Court not award that full amount, the resulting surplus would not revert to Lowe's, but would (at the Court's discretion) be added to the pool distributed to the opt-in Plaintiffs and/or distributed to a cy pres recipient.

The Supreme Court has opined that "[a] request for attorney's fees should not result in a second major litigation," and "[i]deally of course, litigants will settle the amount of the fee." *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (""). Furthermore, the reasonableness of an award can be deduced by evidence of an arm's-length negotiation or an agreement by defendants to a certain amount of fees that does not affect the relief afforded to a settlement class. *See Berry*, 807 F.3d at 618–19 (recognizing that the court may approve a fee request when there is "no reason to think that class counsel left money on the table in negotiation[s]" and there is a "lack of objection [from class members] to the fee request"). As such, because Lowe's is paying Plaintiffs' Counsel's attorneys' fees and litigation expenses separately from the common fund, the primary inquiry should be whether the settlement negotiations were free from fraud or collusion to ensure that counsel did not settle the case for an insufficient amount to secure payment of attorney's fees. "Absent evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Kirven v. Cent. States Health & Life Co.*, C/A No. 3:11-2149-

26

MBS, 2015 WL 1314086, at *5 (D.S.C. Mar. 23, 2015) (finding no collusion based on hard-fought negotiation lasting several weeks); *Muhammad v. Nat'l City Mtg., Inc.*, Civil Action No. 2:07-0423, 2008 WL 5377783, at *4 (S.D. W. Va. Dec. 19, 2008); *Beaulieu v. EQ Indus. Servs., Inc.*, No. 5:06-CV-00400-BR, 2009 WL 2208131, at *24 (W.D.N.C. July 22, 2009) (salient circumstances for purposes of analyzing negotiations are extended nature and whether they were adversarial); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 (4th Cir. 1975) (no collusion found when settlement not hastily arrived at and after protracted discussions).

Further, the "supervision by a mediator lends an air of fairness to agreements that are ultimately reached." *Temp. Servs. Ind. v. Am. Int'l Group Inc.*, C/A No. 3:08-cv-00271-JFA, 2012 WL 4061537, at *12 (D.S.C. Sept. 14, 2012) ("highly adversarial litigation took place before being resolved by a formal, in-person mediation session held before [ ] a former U.S. District Court judge."). Here, the circumstances surrounding settlement establish it was reached at arm's-length and without collusion. The parties ultimately reached a resolution after extensive negotiations with the assistance of a highly-qualified mediator.

Finally, approval of settlements in collective actions under the FLSA generally involves less stringent standards than Rule 23 class settlements. *Clark v. Ecolab Inc.*, 2010 WL 1948198, *7, C.A. No. 07-cv-8623-PAC (S.D.N.Y. May 11, 2010) (unpublished). "Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes." *Id.* (citing *Lynn's Food Stores. Inc. v. United States*, 679 F.2d 1350, 1353 n. 8 (11th Cir. 1982)).

In addition to these guidelines, "[t]he Fourth Circuit generally considers twelve factors in judging the reasonableness of an award of attorneys' fees in FLSA cases":

> (1) the time and labor expended;
> (2) the novelty and difficulty of the questions raised;
> (3) the skill required to properly perform the legal services rendered;

(4) the attorney's opportunity costs in pressing the instant litigation;
(5) the customary fee for like work;
(6) the attorney's expectations at the outset of the litigation;
(7) the time limitations imposed by the client or circumstances;
(8) the amount in controversy and the results obtained;
(9) the experience, reputation and ability of the attorney;
(10) the undesirability of the case within the legal community in which the suit arose;
(11) the nature and length of the professional relationship between attorney and client; and
(12) attorneys' fees awards in similar cases.

*Kirkpatrick*, 352 F. Supp. 3d at 503-04 (citing *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)); *see, e.g., Dickey*, 2021 U.S. Dist. LEXIS 57981, at *9-10; *Hood v. Uber Technologies, Inc.*, 2019 WL 93546, 2019 U.S. Dist. LEXIS 670, *21-22 (M.D.N.C. Jan. 3, 2019); *Beasley*, 2017 U.S. Dist. LEXIS 219975, at *7-8.

As discussed below, the above factors weigh in favor of approving the requested attorney's fee:

<u>*Factor 1 – Time and Labor Expended*</u>:  This factor favors approval because Plaintiffs' Counsel have dedicated a total of 10,907.36 attorney and non-attorney/paralegal hours to this litigation. (*See* Exh. B, Stoops Decl. at ¶¶ 99-100 (summarizing 8,107.9 total hours); Exh. C, Lesser Decl. at ¶ 8 (summarizing 1,784.36 hours and total lodestar of $958,345); Exh. D, Becker Decl. at ¶ 13 (summarizing 814.7 hours and total lodestar of $393,817.50); Exh. E, Mills. Decl. at ¶ 10 (summarizing 200.4 hours and total lodestar of $74,085).

The hours worked by Plaintiffs' Counsel equals total lodestar of $4,662,752.50 which exceeds the fee request by $308,701.19. Further, the total lodestar amount of $4,662,752.50 does not take into account $411,000 in lodestar that was accumulated by Plaintiffs' Counsel and retained local counsel in connection with the 19 state law cases that were separately filed and subsequently consolidated by way of the MDL. (Exh. B, Stoops Decl. at ¶ 100, fn. 10).

<u>*Factor 2 – Novelty and difficulty of the questions raised*</u>:  This factor favors approval because as discussed at pages 2-8, 12-18 *supra*, this collective litigation raised difficult and hotly contested issues.

*Factor 3 – Skill Required to Properly Perform the Legal Services Rendered*:  This factor favors approval because, for over three years Plaintiffs' Counsel have litigated this matter and since April 2020 Plaintiffs' Counsel has gone "head-to-head" with one of the Nation's largest and well-regarded law firms. Throughout this time period, Plaintiffs' Counsel had to take part in over 100 depositions, respond to hundreds of sets of discovery, and brief and argue various complex motions. Moreover, this litigation required Plaintiffs' Counsel to manage hundreds of thousands of pages of documents, and over 165 gigabytes of data, to locate evidence supporting Plaintiffs' FLSA claim.  This project, standing alone, required persistence and skill.

*Factor 4 – Opportunity Costs in Pressing the Instant Litigation*:   This factor favors approval because Plaintiffs' Counsel have worked on a pure contingency basis and have dedicated themselves to the litigation. Further, Plaintiffs' Counsel has paid – without guarantee of recoupment – nearly $1,000,000 in litigation expenses in prosecuting this litigation. As recently observed in another FLSA collective action, "[c]lass and collective wage and hour cases require intensive resources and – particularly when counsel operate, as here, on a contingency basis – pursuing these cases involves opportunity costs and risk." *Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *9.

*Factors 5 and 12 – Customary Fee for Like Work and Fee Awards in Similar Cases*:

This factor favors approval because, in other FLSA collective actions, North Carolina district courts and Courts within the Fourth Circuit have approved attorneys' fee requests in amount substantially higher than the amount of settlement funds allocated to opt-in plaintiffs.[9] For example:

---

[9] It has long been recognized that that fee awards need not be proportionate to the results obtained by a plaintiff. *See Powell v. Carey Int'l., Inc.*, 547 F.Supp.2d 1281, 1286 (S.D.Fla.2008), *aff'd*, 323 Fed.Appx. 829 (11th Cir.2009); *Andrews v. United States*, 122 F.3d 1367, 1376 (11th Cir.1997) (citing *Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986)).

- *Newbanks v. Cellular Sales of Knoxville, Inc.*, 2015 WL 12843763 (D. S.C. February 2, 2015) (approving $175,000 in attorneys' fees/costs, and $100,000 to the FLSA collective members).

- *Irvine v. Destination Wild Dunes Management, Inc.*, 204 F.Supp.3d 846(D. S.C. 2016) (approving $246,000 in attorneys' fees/costs, and $209,000 to the FLSA collective members).

- *Young v. Act Fast Delivery of West Virginia, Inc.*, 2020 WL 4808036 (S.D. W.V. August 18, 2020) (approving $2,250,000 in attorneys' fees/costs, and $2,250,000 to the FLSA collective members).

- *Almendarez v. J.T.T. Enterprises Corp.*, 2010 WL 3385362 (D. Md. August 25, 2010) (approving $96,592.35 in attorneys' fees/costs, and $3,300 to three FLSA plaintiffs).

- *Butler v. Directsat USA, LLC,* 2016 WL 1077158 (D. Md. March 18, 2016) (approving $258,390.67 in attorneys' fees/costs, and $36,000 to FLSA plaintiffs).

- *Atkins v. Sunbelt Rentals, Inc.*, 2016 WL 3647610 (D. Md. June 30, 2016) (approving $95,400 in attorneys' fees/costs, and $30,000 to FLSA plaintiff) ("Although the attorneys' fees are more than three times the damages, attorneys' fees may "substantially exceed [ ] damages" in FLSA cases." [citations omitted]).

- *Amaya v. Power Design, Inc.*, 2018 WL 690838 (D. Md. February 2, 2018) (approving $355,227.24 in attorneys' fees/costs, and $159,020.83 to FLSA collective members).

- *McNeil v. Faneuil, Inc.*, 2018 WL 1411017 (E.D. Virginia March 21, 2018 (approving $696,064 in attorneys' fees/costs, and $285,000 to FLSA collective members).

- *Spencer v. Central Services, LLC*, 2012 WL 142978 (D. Md. January 13, 2012) (approving $57,118.64 in attorneys' fees/costs, and $8,750 to two FLSA plaintiffs).

- *Dorsey v. TGT Consulting, LLC*, 2014 WL 458999 (D. Md. February 4, 2014) (approving $426,781.68 in attorneys' fees/costs, and $240,000 to three FLSA collective members).

_Factor 6 – Expectations at the Outset of the Litigation_:  This factor favors approval because the requested $4,359,253.88 fee is a reasonable expectation where Plaintiffs' Counsel took on a risk of non-payment even as they incurred over $5,000,000 in lodestar and advanced nearly $1,000,000 in litigation expenses to pursue the litigation."

_Factor 7 – Time Limitations Imposed by the Client or Circumstances_:  This factor favors approval because, throughout this litigation, the Court has required all counsel to comply with strict case management deadlines.

*Factor 8 – Amount in Controversy and Results Obtained*:  This factor favors approval because, as explained at pages 16-18 *supra*, the settlement enables Plaintiffs to recover a substantial portion of their alleged unpaid wages. Further, the litigation spurred a modification to Lowe's compensation policies that will guarantee additional compensation to its workforce into the future. This represents an excellent result when viewed against the significant litigation risks.

*Factor 9 – Experience, Reputation and Ability of Attorney*:  This factor favors approval because Plaintiffs' Counsel are experienced employment lawyers who have had substantial success representing clients in the federal courts. (*See* Exh. B, Stoops Decl. at ¶¶ 6-9; *See* Exh. C, Lesser Decl. at ¶¶ 4-5; *See* Exh. D, Becker Decl. at ¶¶ 3-9; *See* Exh. E, Mills Decl. at ¶¶ 1-3; *See* Exh. F, Thompson Decl. at ¶¶ 4-8).

*Factor 10 – Undesirability of the Case within the Legal Community*:  This factor weighs in favor of Plaintiffs' Counsel because most law firms do not have the resources or appetite to risk nearly $1,000,000 in out of pocket litigation expenses and over $5,000,000 in working time.

*Factor 11 – Nature and Length of the Professional Relationship Between Attorney and Client*:  This factor is "inconsequential" where, as here, Plaintiffs' Counsel have no pre-existing relationship with the Plaintiffs.  *See Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *11-12.

*Summary*:  In sum, eleven of the twelve pertinent factors support approval of the requested $4,359,253.88 attorneys' fee. The remaining factor is "inconsequential" (Factor 11).

### e. The requested litigation expenses and settlement administration fees are reasonable.

North Carolina district courts reviewing FLSA collective settlement also review any litigation expenses for reasonableness. *See, e.g.*, *Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *13. Here, Plaintiffs' Counsel seek the reimbursement of $992,754.30 in litigation expenses. These expenses are detailed and supported in the accompanying declarations and were reasonably and necessarily incurred considering the duration, scope, and complexity of this nationwide collective

action. (*See* Exh. B, Stoops Decl. at ¶¶ 114-116; *See* Exh. C, Lesser Decl. at ¶ 9; *See* Exh. D, Becker Decl. at ¶ 13; *See* Exh. E, Mills Decl. at ¶ 12).

The opt-in Plaintiffs will be serviced by professional services provider Rust Consulting, who will serve as settlement administrator. Rust Consulting has been approved by Courts across the country and is perhaps the leading settlement administrator for class actions in the country. Plaintiffs' Counsel have used their services in numerous settlements of this nature and found its services exemplary. (Exh. B, Stoops Decl. at ¶ 112). Estimates provided by Rust Consulting indicate that settlement administration for this case will not exceed $25,850. The amount is reasonable given the number of individuals involved in the Settlement.

### f. The proposed incentive awards are reasonable.

Courts reviewing FLSA collective settlement also review any incentive awards for reasonableness. *See, e.g., Reynolds*, 2020 U.S. Dist. LEXIS 2718, at *13-16. Here, the settlement calls for the following incentive awards in a cumulative amount of $142,400 distributed as follows:

a.   $46,000 to be distributed equally ($2,000 each) to the 23 Named Plaintiffs.

b.   $66,550 to be distributed equally ($875 each) to the 76 opt-in Plaintiffs (other than Named Plaintiffs) who were deposed and participated in written discovery and have not been dismissed from the Action.

c.   $29,850 to be distributed equally ($150 each) to the 199 opt-in Plaintiffs who participated in written discovery but did not sit for a deposition and have not been dismissed from the Action.

In class/collective litigation, such service payments "compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011).

Incentive awards

> are particularly appropriate in the employment context. In employment
> litigation, the plaintiff is often a former or current employee of the
> defendant, and thus, by lending his name to the litigation, he has, for the
> benefit of the class as a whole, undertaken the risk of adverse actions by
> the employer or co-workers. . . . Although this Court has no reason to
> believe that [the defendant] has or will take retaliatory action towards
> either [Plaintiff] or any of the plaintiffs in this case, the fear of adverse
> consequences or lost opportunities cannot be dismissed as insincere or
> unfounded.

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187-188 (W.D.N.Y. 2005) (internal citations
omitted).

Here, the requested incentive awards are warranted. The Named Plaintiffs and opt-in

Plaintiffs who took part in discovery were critical components to the litigation. They enabled

Plaintiffs' Counsel to understand the claims at issue and provided evidence necessary to prosecute

the claims and obtain settlement. Each of these individuals were diligent advocates for the other

opt-in Plaintiffs and they dedicated substantial time and effort to the case.

The requested Named Plaintiff incentive awards fall well below the typical range of

awards approved by North Carolina district courts in both FLSA collective settlements, *see*, *e.g.*,

*Myers v. Loomis Armored US, LLC*, 2020 WL 1815902, 2020 U.S. Dist. LEXIS 62941, *18

(W.D.N.C. April 8, 2020) ($20,000 award); *Beasley*, 2017 U.S. Dist. LEXIS 219975, at *9-10

($15,000 awards to two plaintiffs and $10,000 award to third plaintiff), and in other types of class

actions, *see*, *e.g.*, *Gaston v. LexisNexis Risk Solutions Inc.*, 2021 WL 2077812, 2021 U.S. Dist.

LEXIS 97538, *21-22 (W.D.N.C. May 24, 2021) (Bell, J.) ($20,000 award in Driver Privacy

Protection Act); *Sims v. BB&T Corp.*, 2019 U.S. Dist. LEXIS 75839, *18 (M.D.N.C. May 6,

2019) ($20,000 award in ERISA class action); *Kruger*, 2016 U.S. Dist. LEXIS 193107, at *17-

18 ($25,000 award in ERISA class action).

Finally, the $875 incentive awards to each of the 76 opt-in Plaintiffs who were deposed

and the $150 incentive awards to the 199 opt-in Plaintiffs who participated in written discovery

are also warranted. These depositions lasted several hours and required substantial advance preparation. Also, all of these individuals answer written interrogatories and locate and produce pertinent documents. The entire collective has benefitted by these opt-in Plaintiffs' dedication to the litigation, and the incentive awards are well-deserved. *See e.g., Myers*, 2020 U.S. Dist. LEXIS 62941, at \*18 ($4,000-$5,000 awards to opt-ins who participated in discovery and sat for depositions); *Wineland v. Casey's Gen. Stores, Inc.*, 267 F.R.D. 669, 677–78 (S.D.Iowa 2009) (approving incentive payments of $1,000 for each deponent in FLSA case).

## IV. CONCLUSION

For all the above reasons, Plaintiffs submit that the settlement warrants approval in full. Accordingly, Plaintiffs respectfully ask the Court to grant this motion and sign and enter the accompanying proposed order approving the settlement. (Exh. G, Proposed Order).

Dated: May 20, 2022                  Respectfully submitted,

/s/ *Kevin J. Stoops*
Kevin J. Stoops (admitted *pro hac vice*)
Jason J. Thompson (admitted *pro hac vice*)
Rod M. Johnston (admitted *pro hac vice*)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
kstoops@sommerspc.com
rjohnston@sommerspc.com
jthompson@sommerspc.com

Seth R. Lesser (admitted *pro hac vice*)
KLAFTER LESSER, LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
Phone: (914) 934-9200
seth@klafterlesser.com

Timothy Becker, Esq.  (MN ID #0256663)
444 Cedar Street, Suite 1800
St. Paul, MN 55101
(612) 436-1800
tbecker@johnsonbecker.com

*Attorneys for Plaintiffs and the Putative*
*Class/Collective Action Members*

## CERTIFICATE OF SERVICE

I certify that on May 20, 2022, I electronically filed the forgoing document with the Clerk of the

Court using the ECF system, which will send notification of such filing to all counsel of record.

*/s/ Kevin J. Stoops* _____